Kenneth DONAHUE and Nomad
Lawson, Plaintiffs,

v.

RHODE ISLAND DEPARTMENT OF
MENTAL HEALTH, RETARDATION
AND HOSPITALS, By and Through its
Director, Thomas D. ROMEO, the State
of Rhode Island, By and Through its
Treasurer, Roger Begin, and John Doe,
Richard Roe and Peter Poe, Defendants.

Civ. A. No. 84–0411–S.

United States District Court,
D. Rhode Island.

April 17, 1986.

Hutton & Hickey, Edward C. Roy, Roney & Labinger, Lynette Labinger, Providence, R.I., for plaintiffs.

Deborah P. Clarke, Legal Counsel R.I. Dept. of Mental Health, Retardation & Hospitals, Cranston, R.I., and Arlene Violet, Atty. Gen., Richard B. Wooley, Sp. Asst. Atty. Gen., Providence, R.I., for defendants.

## OPINION

SELYA, District Judge.

This is a civil action originally brought by Kenneth Donahue against the Rhode Island Department of Mental Health, Retardation and Hospitals (MHRH), the state of Rhode Island, and several unidentified state employees. MHRH is a part of the executive branch of state government. For ease in reference, the defendants, collectively, will be referred to as "MHRH" or "the state."

Donahue's amended complaint is in two counts. He seeks, first, a declaration that the Rhode Island statute governing the emergency commitment of alcoholics, R.I. Gen. Laws § 40.1–4–11 (Supp.1985), transgresses the guarantees of the federal Constitution. His second statement of claim is more personalized: he avers in substance that, in the course of his commitment by MHRH under the statute, various state actors failed to honor rights secured to him by the law and by the regulations promulgated thereunder, thereby violating his constitutionally protected liberty interests and paving the way for an award of money damages. Nomad Lawson subsequently filed virtually identical claims against the state.[1]

After certain preliminary skirmishing (not material here), this court on September 13, 1985 bifurcated the claims and ordered a preliminary hearing, Fed.R.Civ.P. 12(d), as to count I of the amended complaint. Following an extended briefing period, oral arguments were entertained on December 6, 1985. Thereafter, a supplementary hearing was held, at which time a variety of documentary evidence anent the circumstances of the plaintiffs' commitments was introduced into evidence. Decision having been reserved, this opinion comprises the court's findings and conclusions concerning the constitutionality *vel non* of the statute at issue.

## I. THE STATUTORY SCHEME

In order to put this matter into proper perspective, it is necessary first to examine the methodology which the Rhode Island General Assembly has adopted for dealing governmentally with the problems of alcoholism in modern society.

The rudiments of the statutory framework were set in place some thirty-five years ago. *See* P.L.1951, ch. 2755, §§ 1–22. The enactment was substantially revised and augmented some twenty years later, *see* P.L.1972, ch. 130, § 1, and renamed as the Alcoholism and Intoxication Treatment Act RIAITA). *Id.* at § 2. This reformulation followed upon the heels of, and was plainly influenced by, the publication of the proposed Uniform Alcoholism and Treatment Act, 9 U.L.A. 57–110 (1971) (Uniform Act). The RIAITA was further amended at various intervals, *e.g.*, P.L. 1973, ch. 186, § 1; P.L.1973, ch. 196, § 1; P.L.1977, ch. 217, § 1; P.L.1979, ch. 364, §§ 1–2, and was further modified in 1984. *See* P.L.1984, ch. 122, § 1. In that same legislative session, the RIAITA was reenacted effective May 4, 1984, *see* P.L.1984,

---

1. On October 18, 1985, Donahue moved for leave to file a second amended complaint. No objection appearing, that motion was granted by rule of court on November 7, 1985. The sole purport of the amendment was to add Lawson as an additional party plaintiff. Though the defendants never formally answered the second amended complaint, the ensuing arguments, *see*

*post,* were based on that pleading, and Lawson's counsel participated fully in the proceedings from November 7 forward. Thus, the court accepts the implied agreement of the parties and treats the defendants' answer to the amended complaint as their answer to the second amended complaint. Consequently, both Donahue and Lawson are properly before the court.

ch. 81, § 4, and is now codified as R.I.Gen. Laws §§ 40.1–4–1 to 40.1–4–19 (1984 & Supp.1985). It is this most current version of the RIAITA which the plaintiffs challenge in this proceeding.

The tone of the Act is reflected in its declaration of policy, which announces:

> The problem of alcoholism, with its attendant effects upon the economic condition of alcoholics and those dependent upon them, and the substantial physical deterioration brought about by the misuse of alcohol, has, as shown by the studies, become more and more a major concern of government. Those who, through the misuse of alcohol, adversely affect their health and their economic independence have in recent years increased in number. This chapter is designed to provide proper treatment for those who have been habitually misusing alcohol as a beverage. It is the further policy of this state that alcoholics and intoxicated persons may not be subjected to criminal prosecution because of their consumption of alcoholic beverages but rather should be afforded a continuum of treatment in order that they may lead normal lives as productive members of society.

R.I.Gen.Laws § 40.1–4–1.

The Act then spells out a litany of defined terms, *id.* at § 40.1–4–2, several of which are of critical importance at this juncture:

> (1) "Alcoholic" means a person who habitually lacks self-control as to the use of alcoholic beverages, or uses alcoholic beverages to the extent that his health is substantially impaired or endangered or his social or economic function is substantially disrupted;

> \* \* \* \* \* \*

> (6) "Intoxicated person" means a person whose mental or physical functioning is substantially impaired as a result of the use of alcohol;

> (7) "Incapacitated by alcohol" means a person, who as a result of the use of alcohol is intoxicated to such an extent that he is unconscious or has his judgment otherwise so impaired that he is

incapable of realizing and making a rational decision with respect to his need for treatment;

> \* \* \* \* \* \*

> (9) "Treatment" means the broad range of emergency, outpatient, intermediate, and inpatient services and care, including diagnostic evaluation, medical, psychiatric, psychological, and social service care, vocational rehabilitation and career counseling, which may be extended to alcoholics and intoxicated persons.

R.I.Gen.Laws § 40.1–4–2(1), (6), (7), (9).

MHRH is given broad powers to plan, establish, maintain, administer, supervise, and coordinate programs for the care and treatment of alcoholics and intoxicated persons, *e.g.*, R.I.Gen.Laws § 40.1–4–3, and is charged with substantial duties in these respects. *E.g., id.* at § 40.1–4–4. These duties embrace the establishment of "a comprehensive and coordinated program for the treatment of alcoholics and intoxicated persons," *id.* at § 40.1–4–6(1), designed to include, inter alia, "emergency treatment." *Id.* at § 40.1–4–6(2)(a). MHRH sets standards applicable to both public and private treatment facilities, *id.* at § 40.1–4–7, and is responsible for periodic inspections of all such institutions. *Id.* Subject to a handful of legislatively-decreed standards, MHRH is empowered to promulgate rules governing the acceptance of persons into approved treatment programs. *Id.* at § 40.1–4–8. One such legislative directive requires that, to the extent "possible, a patient shall be treated on a voluntary rather than an involuntary basis." *Id.* at § 40.1–4–8(1)(a).

The RIAITA then proceeds to discuss in considerable detail the voluntary care of alcoholics, R.I.Gen.Laws § 40.1–4–9, treatment and services for intoxicated persons and those incapacitated by alcohol, *id.* at § 40.1–4–10, and a rubric governing certain (less controversial) aspects of the involuntary commitment of alcoholics, essentially in "nonemergency" situations. *Id.* at § 40.1–4–12. Interleaved among these substantive provisions is the statute which is at issue here. Its full text follows:

(1) An intoxicated person who (a) has threatened, attempted, or inflicted physical harm on himself/herself or another and is likely to inflict physical harm on himself/herself or another unless committed, or (b) is incapacitated by alcohol, may be committed to an approved public treatment facility for emergency treatment. A refusal to undergo treatment does not constitute evidence of lack of judgment as to the need for treatment.
(2) The certifying physician, spouse, guardian, or relative of the person to be committed, or any other responsible person, may make a written application for commitment under this section, directed to the administrator of the approved public treatment facility. The application shall state facts to support the need for emergency treatment and be accompanied by a physician's certificate stating that he has examined the person sought to be committed within two (2) days before the certificate's date and facts supporting the need for emergency treatment.
(3) Upon approval of the application by the administrator in charge of the approved public treatment facility, the person shall be brought to the facility by a peace officer, health officer, the applicant for commitment, the patient's spouse, the patient's guardian, or any other interested person. The person shall be retained at the facility to which he was admitted, or transferred to another appropriate public or private treatment facility, until discharged under subsection (5).
(4) The administrator in charge of an approved public treatment facility shall refuse an application if in his opinion the application and certificate failed to sustain the grounds for commitment.
(5) When, on the advice of the medical staff, the administrator determines that the grounds for commitment no longer exist, he shall discharge a person committed under this section. No person committed under this section may be detained in any treatment facility for more than ten (10) days. If a petition for involuntary commitment under § 40.1–4–

12 has been filed within the ten (10) days and the administrator in charge of an approved public treatment facility finds that grounds for emergency commitment still exist, he may detain the person until the petition has been heard and determined, but no longer than ten (10) days after filing the petition.
(6) A copy of the written application for commitment and of the physician's certificate, and a written explanation of the person's right to counsel, shall be given to the person within twenty-four (24) hours after commitment by the administrator, who shall provide a reasonable opportunity for the person to consult counsel.

R.I.Gen.Laws § 40.1–4–11.

Commitment—voluntary or involuntary—under the RIAITA is attended by a multitude of humanitarian safeguards. *E.g.*, R.I.Gen.Laws § 40.1–4–13(1) (confidentiality of records); § 40.1–4–14(1) (visitation rights; opportunity for consultation with counsel); § 40.1–4–14(2) (privacy of mail and other communications). And, where an admission occurs under the aegis of § 40.1–4–11, MHRH is bound by statute to "provide for adequate and appropriate treatment." R.I.Gen.Laws § 40.1–4–6(3).

## II. THE CIRCUMSTANCES OF THE PLAINTIFFS' CONFINEMENTS

According to the stipulation agreed to by the parties and the records entered into evidence on December 16, 1985, Donahue was admitted to a public treatment facility on December 7, 1984 and was discharged on December 11, 1984. Though not unconscious when admitted, Donahue did not surrender himself freely. The basis for his entrance into the facility was § 40.1–4–11(1)(b), that is, he was "incapacitated by alcohol."

Lawson was enrolled into the same treatment facility five times between April 1982 and October 1984, and was not unconscious at the time of any of the admission decisions. Of these five episodes, one was a voluntary commitment under § 40.1–4–9 and is not at issue in this case. On the

other four occasions, a variety of RIAITA provisions were arguably implicated,[2] viz.:

1. From April 21, 1982 to April 25, 1982, and again from October 3, 1984 to October 4, 1984, Lawson was retained under the emergency commitment provisions, §§ 40.-1–4–11(1)(a) and (b).

2. From August 20, 1983 to August 23, 1983, the nature of Lawson's admission remains somewhat obscure; based on the documentary evidence, it is difficult to say whether the emergency and/or the voluntary commitment provisions were invoked.

3. From May 2, 1984 to May 7, 1984, Lawson was confined pursuant to the emergency commitment "incapacitated by alcohol" provision, § 40.1–4–11(1)(b).

### III. ISSUES PRESENTED

In its present posture, this action focuses the court's attention on a brace of constitutional challenges. Both of these initiatives attempt to test the validity of R.I.Gen. Laws § 40.1–4–11 against standards imposed by the fourteenth amendment to the United States Constitution, and more particularly, the Due Process Clause thereof. The Clause provides in pertinent part that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

Notwithstanding the broad language of the Clause and the salient societal stake in permitting an individual to go about his own affairs unimpeded by the sovereign, even so fundamental a liberty interest may be abridged. The critical questions in this case, therefore, relate less to the state's power to impose statutory conditions on the liberty of an imbiber than to whether or not Rhode Island, in exercising such power, has done so in a manner which comports with the imperatives of the Constitution. That is to say, given the deprivation of liberty which § 40.1–4–11 admittedly works, has the state afforded to those persons who, like Donahue and Lawson, may

be caught in the statutory snare all of the process that is "due"?

The plaintiffs suggest that this inquiry must realistically be answered in the negative. They posit two essential reasons in support of their conclusion. First, they view the statutory mise-en-scene as failing to provide adequate procedural safeguards to pass federal constitutional muster. Second, they find § 40.1–4–11 to be so vague, uncertain, and overbroad as to run afoul of the requirements of the Due Process Clause. MHRH, predictably, debunks both of these notions. From the state's perspective, § 40.1–4–11 represents a reasoned and reasonable response to a social problem of compelling state interest. MHRH sees the statute as being closely tailored to suit the most discerning constitutional tastes.

The court will examine each of these bones of contention in an attempt to determine whether or not the plaintiffs' asseverations suffice to tip the exquisite balance of the scales of constitutionality.

### IV. PROCEDURAL DUE PROCESS

The plaintiffs contend that R.I.Gen.Laws § 40.1–4–11 does not afford the minimum procedural prophylaxis mandated by the Due Process Clause. The plaintiffs diagnose the statute as fatally infected by a sin of omission: its perceived failure to require a prompt probable cause hearing or some surrogate type of timely compulsory review of the emergency involuntary commitment of intoxicated persons. In the absence of a quick mandatory hearing, the plaintiffs' thesis runs, the legislation's procedural mechanisms provide only "an empty promise" and "illusory protection." *See* Plaintiffs' Brief at 18.

In the recent past, the Supreme Court has clarified the principle that civil commitment for whatever purpose requires due process protection. *See Vitek v. Jones,* 445 U.S. 480, 491–92, 100 S.Ct. 1254, 1262, 1263

---

**2.** In outlining the statutory bases for Lawson's various detentions, the court is guided by the stipulation among the parties. Except as to the May 1984 vignette, the stipulation does not indicate the specific statutes upon which the treat-

ment facility relied anent Lawson's several nonvoluntary admissions. The court carefully reviewed the medical records for these commitments, and found them to be singularly unenlightening in this respect.

(1980); *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979); *O'Connor v. Donaldson,* 422 U.S. 563, 573–76, 95 S.Ct. 2486, 92–94, 45 L.Ed.2d 396 (1975); *Jackson v. Indiana,* 406 U.S. 715, 731–79, 92 S.Ct. 1845, 1854–76, 32 L.Ed.2d 435 (1972); *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972). In an oft-cited concurrence, Chief Justice Burger declaimed that "[t]here can be no doubt that involuntary commitment to a mental hospital, like involuntary confinement of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law." *O'Connor,* 422 U.S. at 580, 95 S.Ct. at 2496 (Burger, C.J., concurring). In *Vitek,* a case which likewise dealt with the commitment of patients to a mental hospital, the Court embroidered this theme:

> [F]or the ordinary citizen, commitment ... produces "a massive curtailment of liberty," and in consequence "requires due process protection." The loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement. It is indisputable that commitment ... "can engender adverse social consequences to the individual" and that "[w]hether we label this phenomena 'stigma' or choose to call it something else ... we recognize that it can occur and that it can have a very significant impact on the individual." Also, "[a]mong the historic liberties" protected by the Due Process Clause is the "right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security."

445 U.S. at 491–92, 100 S.Ct. at 1262–63 (citations omitted).

The state's ability to commit its citizens involuntarily has a double-pillared foundation: it is bottomed upon both the sovereign's parens patriae interest "in providing care to its citizens who are unable to care for themselves," *Addington,* 441 U.S. at 426, 99 S.Ct. at 1809, and the state's police power interest in preventing individuals from endangering others. *See Rogers v. Okin,* 634 F.2d 650, 654–59 (1st Cir.1980), *vacated and remanded sub nom. Mills v. Rogers,* 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982). *See also Project Release v. Prevost,* 722 F.2d 960, 971 (2d Cir.1983). Because involuntary confinement is "a massive curtailment of liberty," *Humphrey,* 405 U.S. at 509, 92 S.Ct. at 1052,

> a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends.

*O'Connor,* 422 U.S. at 576, 95 S.Ct. at 2494.

To determine whether the procedures used to confine an individual against his or her will comport with the imperatives of due process, so as not to immure those "capable of surviving safely in freedom," *id.,* it is incumbent upon the state, in the first instance, and ultimately upon the judiciary, delicately to integrate the factors set out by the Supreme Court in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976):

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*See also Parham v. J.R.,* 442 U.S. 584, 599–617, 99 S.Ct. 2493, 2502–11, 61 L.Ed.2d 101 (1979) (applying balancing test to voluntary commitment of children to state mental hospitals).

In juxtaposing due process principles with the involuntary confinement of the mentally ill, the Court has stressed that, even if the "original confinement was founded upon a constitutionally adequate basis, ... it could not constitutionally continue after that basis no longer existed." *O'Connor,* 422 U.S. at 574–75, 95 S.Ct. at 2493 (citations omitted). *See also id.* at

580, 95 S.Ct. at 2496 (Burger, C.J., concurring) ("[T]he reasons for committing a particular individual must be established in an appropriate proceeding.... [C]onfinement must cease when those reasons no longer exist."). But, these precepts are not self-explanatory: both the appropriateness and the timing of such proceedings must be measured in the context of a particular case. Despite the fact that the tenets of due process date back to the beginnings of the republic and beyond, the precise ways of due process are not carved in granite. "It has been said so often by [the Supreme] Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

Though there is no surefire litmus test by which the quality of a given subset of procedures can be measured with assurance, some lines have been distinctly drawn. It is settled that the hearing which determines the constitutionality of the confinement need not take place before the deprivation occurs. To be sure, in a case concerning a seizure of property, the Court has stated that "an individual [must] be given an opportunity for a hearing *before* he is deprived of any significant property interest, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971) (emphasis original; footnotes omitted). But, emergency commitment of intoxicated persons represents exactly the sort of "extraordinary situation" of which *Boddie* speaks. A strong comparison can be drawn to the annals of psychiatric affliction: where the state has involuntarily committed a mentally ill person on an emergency basis, courts have been unanimous in holding that a deprivation hearing was not required. *See, e.g., Luna v. Van Zandt,* 554 F.Supp. 68, 72 (S.D.Tex.1982); *Doe v. Gallinot*, 486 F.Supp. 983, 993 (C.D.Cal.1979), *aff'd*, 657 F.2d 1017 (9th Cir.1981); *Suzuki v. Quisenberry*, 411 F.Supp. 1113, 1125–26 (D.Ha-

waii 1976); *Coll v. Hyland*, 411 F.Supp. 905, 910 (D.N.J.1976) (three-judge court); *Bartley v. Kremens*, 402 F.Supp. 1039, 1049 (E.D.Pa.1975) (three-judge court), *vacated*, 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977); *Lynch v. Baxley*, 386 F.Supp. 378, 387 (M.D.Ala.1974) (three-judge court); *Bell v. Wayne County General Hospital at Eloise*, 384 F.Supp. 1085, 1098 (E.D.Mich.1974) (three-judge court); *Lessard v. Schmidt*, 349 F.Supp. 1078, 1091 (E.D.Wis.1972) (three-judge court), *vacated & remanded*, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974); *Logan v. Arafeh*, 346 F.Supp. 1265, 1268 (D.Conn.1972) (three-judge court), *aff'd sub nom. Briggs v. Arafeh*, 411 U.S. 911, 93 S.Ct. 1556, 36 L.Ed.2d 304 (1973). The emergency commitment of alcoholics has been accorded precisely the same kind of judicial reception.

The guidelines grow considerably more indistinct, however, in evaluating what process is due after such a deprivation of liberty has occurred, that is, the adequacy and chronometry of the post-confinement review. In harmony with the more enlightened of the mental illness cases, it has consentiently been held that the individual "must be given a hearing within a reasonable time to test whether the confinement is based upon probable cause." *In re Barnard*, 455 F.2d 1370, 1374–75 (D.C.Cir. 1971). *See also Project Release*, 722 F.2d at 974; *Luna*, 554 F.Supp. at 72; *French v. Blackburn*, 428 F.Supp. 1351, 1355 (M.D.N. C.1977) (three-judge court), *aff'd*, 443 U.S. 901, 99 S.Ct. 3091, 61 L.Ed.2d 869 (1979); *Coll*, 411 F.Supp. at 910; *Doremus v. Farrell*, 407 F.Supp. 509, 515 (D.Neb.1975) (three-judge court); *Bartley*, 402 F.Supp. at 1049; *Lynch*, 386 F.Supp. at 388; *Bell*, 384 F.Supp. at 1098; *Logan*, 346 F.Supp. at 1268. There has been no similar consensus on the amount of time which may elapse before a probable cause hearing occurs. Indeed, the judicial cacophony has been deafening. Several courts, for example, have upheld statutes which do not provide involuntarily detained individuals with a hearing for periods of ten days or longer. *See Project Release*, 722 F.2d at 974–75 (fifteen days); *French*, 428 F.Supp. at 1355

(ten days); *Coll*, 411 F.Supp. at 910–11 (twenty days); *Logan*, 346 F.Supp. at 1268–70 (forty-five days). On the other hand, it has sometimes been held that the sovereign must afford hearings within much more tightly constricted time limits. *See Doe*, 657 F.2d at 1023–24 (hearing must occur within three days); *Barnard*, 455 F.2d at 1375 (seven days); *Doremus*, 407 F.Supp. at 515 (five days); *Bartley*, 402 F.Supp. at 1049 (three days); *Lynch*, 386 F.Supp. at 388 (seven days); *Bell*, 384 F.Supp. at 1098 (five days); *Lessard*, 349 F.Supp. at 1083 (two days).

■ What emerges most clearly from these murky environs is that no specific time limit can automatically be accorded talismanic effect. Although due process dictates that one who has been (or is in jeopardy of being) deprived of a constitutionally sacrosanct interest must be ceded an opportunity to be heard "at a meaningful time and in a meaningful manner," *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1945), the term "meaningful" is not susceptible to fine calibration. As one three-judge district court accurately noted:

> The issue ... should not be phrased, nor should it be resolved, in terms of required days, hours, or minutes, but should rather turn on the basis of the interests involved and fundamental fairness. The due process clause does not deal in magic numbers, but fundamental fairness.

*French*, 428 F.Supp. at 1355.

This court turns, therefore, to a consideration of the triptych which *Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903, has portrayed as governing the due process equation.

### A. *Private Interests*

With respect to the "private interest that will be affected by the official action," there can be little dispute that any involuntary detention is a "massive curtailment of liberty." *Humphrey*, 405 U.S. at 509, 92 S.Ct. at 1052. Yet, the ten day detention permitted under R.I.Gen.Laws § 40.1–4–11 does not carry with it the potential for abuse commonly associated with extreme deprivations of freedom. In this wise, the RIAITA is vastly different from the statute at issue in *O'Connor*, 422 U.S. at 574–76, 95 S.Ct. at 2493–94, where an individual was confined for fifteen years "for care, maintenance, and treatment" without a showing of dangerousness, or the one at bar in *Jackson*, 406 U.S. at 736–39, 92 S.Ct. at 1857–58, where an individual incompetent to stand trial could be impounded indefinitely without reference to dangerousness. Under the terms of the RIAITA, an intoxicated person cannot be taken into custody merely for safekeeping. Rather, the individual is "committed to an approved public treatment facility *for emergency treatment.*" R.I.Gen.Laws § 40.1–4–11(1) (emphasis added). Courts, with good reason, have considered the assurance of treatment significant to the due process equation. *See, e.g., Luna*, 554 F.Supp. at 73–74; *French*, 428 F.Supp. at 1354–55; *Logan*, 346 F.Supp. at 1269.

In *French*, for example, the court upheld a North Carolina statute, finding that

> although [the commitment proceeding] involves a deprivation of liberty, the very purpose of that deprivation is not solely to protect society but also has as a purpose the protection, treatment, and aid of an individual who cannot or will not protect himself.

428 F.Supp. at 1354.

The *Logan* court made the same point in a slightly different way, indicating that a fifteen day leeway after initial commitment before judicial proceedings must be begun is not simply for the purpose of delay.... There is a compensating advantage to the committed person because in many cases during this period the medical staff at the hospital can adequately alleviate his mental illness or by use of nonemergency diagnostic procedures determine that he is not a "danger to himself or others."

346 F.Supp. at 1268–69. Thus, although any involuntary confinement has a significant impact on an individual's liberty, the emergency detention authorized under § 40.1–4–11 does not tip the weighbeam

irretrievably in favor of an earlier (mandatory) probable cause hearing. The RIAITA scheme limits the infringement on an individual's private interests by requiring immediate medical treatment of those detained involuntarily pursuant to the emergency provision. In that sense, it compensates for the curtailment of freedom (at least in part) by the assurance of care and treatment.

### B. *Public Interest*

The state's interest in preventing individuals from harming themselves or others, which is based upon government's police and parens patriae powers, is a preeminent one. State officials must have the flexibility to detain dangerous individuals in exigent circumstances without undue interference or needlessly burdensome restrictions. The Supreme Court has been wary of laying difficult procedural obstacles in the path of civil commitment for fear that the state's hands will become tied. Thus, in rejecting the application of the "reasonable doubt" standard to civil commitments, the Court noted:

> [T]he reasonable-doubt standard is inappropriate in civil commitment proceedings because, given the uncertainties of psychiatric diagnosis, *it may impose a burden the state cannot meet and thereby erect an unreasonable barrier to needed medical treatment.*

*Addington,* 441 U.S. at 432, 99 S.Ct. at 1813 (emphasis added). *See also Project Release,* 722 F.2d at 975 (quoting *Addington* in rejecting a challenge to New York's emergency commitment scheme).

Following the Supreme Court's lead, lower courts which have examined involuntary detention statutes have looked to the state's objectives in the early days of quarantine. It seems apodictic "that the hospital authorities must be allowed some time to conduct adequate testing and observation of the patient so that a diagnosis can be made." *Coll,* 411 F.Supp. at 911. *See also Logan,* 346 F.Supp. at 1269. Treatment in this early phase may not only aid the individual, but "also may be necessary to an adequate and informed hearing on the necessity of ... confinement."

*French,* 428 F.Supp. at 1355. In evaluating the constitutionality of Rhode Island's statute, "[c]onsideration also must be given to the necessities of court administration and the opportunity for counsel to prepare for an effective ·hearing." *Coll,* 411 F.Supp. at 911. When these ingredients are blended into the mix, the RIAITA emergency commitment provisions appear roughly synchronous with the public weal.

### C. *Risk of Erroneous Deprivation*

Finally, the court must consider the "risk of erroneous deprivation of [liberty] through the procedures used." *Mathews,* 424 U.S. at 335, 96 S.Ct. at 903. The Supreme Court has acknowledged the possibility of mistaken confinement of the mentally ill. *See Addington,* 441 U.S. at 428–29, 99 S.Ct. at 1810–11. It has made the same point as to alcoholics. *Powell v. Texas,* 392 U.S. 514, 529–31, 88 S.Ct. 2145, 2152–53, 20 L.Ed.2d 1254 (1968). In concluding that civil commitment proceedings should be governed by a standard of proof "greater than the preponderance-of-the-evidence standard applicable to other categories of civil cases," *Addington,* 441 U.S. at 433, 99 S.Ct. at 1813, the Court emphasized that judges "must be mindful that the function of legal process is to minimize the risk of erroneous decisions." *Id.* at 425, 99 S.Ct. at 1809. Because the Court found that there "is the possible risk that a factfinder might decide to commit an individual based solely on a few isolated instances of unusual conduct," *id.* at 427, 99 S.Ct. at 1810, it determined that "[t]he individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any harm to the state." *Id.*

Several courts which have evaluated emergency detention statutes have paid considerable heed to the chance of error. According to one court, "[t]he question ... is what procedures are needed to minimize the risk of errors in confinement decisions without undercutting 'efforts to further the legitimate interest of both the state and the patient that are served by' extended delay." *Luna,* 554 F.Supp. at 74 (quoting

*Addington,* 441 U.S. at 430, 99 S.Ct. at 1812). *Luna* found that "the risk of error in all commitment decisions is relatively high." 554 F.Supp. at 74. Another court, after extensive assessment of county and hospital release statistics, *Doe,* 486 F.Supp. at 989–90, found a "substantial risk of erroneous application." *Id.* at 992. Both *Luna* and *Doe* concluded that, largely for this reason, due process required a probable cause hearing within seventy-two hours. *Luna,* 554 F.Supp. at 76; *Doe,* 486 F.Supp. at 994. These holdings are summed up well in *Doe:*

> [The state's] benevolent motivation cannot be a substitute for procedural safeguards.... "Our concepts of due process would not tolerate such a 'trade-off.'" The central question is not one of motivation but of risk of error and the procedure necessary to minimize it.

486 F.Supp. at 994 (quoting *O'Connor,* 422 U.S. at 589, 95 S.Ct. at 2500 (Burger, C.J., concurring)).

It is surpassingly difficult to quarrel with the factual premise: any court disinclined to bury its head in the sand must recognize that the risk of mistakes is omnipresent in these straitened circumstances. Still, this element, alone and in isolation, cannot be dispositive. Civilization has discovered few benefits which do not carry the unwanted baggage of corollary costs. And, no matter how high the fence of procedural protections is raised, all possibility of error cannot be obliterated short of total governmental paralysis.

### D. *The Calculus*

It must be remembered that the chronometry of a mandatory probable cause hearing cannot be studied in isolation. Rather, this court's task is to determine whether the period which may elapse short of a hearing is "part of a statutory scheme which, taken as a whole, renders [it] fundamentally fair in accordance with due process." *Project Release,* 551 F.Supp. at 1307. *See also Project Release,* 722 F.2d at 974–75 (finding New York law constitutional upon perscrutation of the "statute as a whole"). Given our paucity of knowledge as a society about the origins and ways of alcoholism, "fair" solutions are bound to be elusive, no matter how dogged the quest. Mathematical precision is, in this nether region, a mere velliety; we can, at best, aspire to achieve equitable approximations.

There is little doubt that the government's decision to detain an individual without a predeprivation hearing is peculiarly prone to the hazards of error. Nevertheless, in a carefully-balanced appraisal of the panorama, the state's interest in swiftly restraining a person who is dangerous or unable to cope overwhelms the individual's interest in an immediate predeprivation hearing and the risk of imperfection endemic to this procedure. The focal point of inquiry, then, is the extent to which postdeprivation procedures may be mistakeprone and "the probable value, if any, of additional or substitute procedural safeguards." *Mathews,* 424 U.S. at 335, 96 S.Ct. at 903.

The statute at issue, R.I.Gen.Laws § 40.-1–4–11, is not devoid of protective coloration. The application for emergency treatment, which can be made by "[t]he certifying physician, spouse, guardian or relative of the person to be committed," must be "accompanied by a physician's certificate." R.I.Gen.Laws § 40.1–4–11(2). The application must then be approved by the administrator of the treatment facility, *id.* at § 40.4–11(3), who "shall refuse an application if in his opinion the application and certificate failed to sustain the grounds for commitment." *Id.* at § 40.1–4–11(4). After confinement has become a reality, the administrator must discharge the individual if and when "grounds for commitment no longer exist." *Id.* at § 40.1–4–11(5).[3] Moreover, the detainee is not left in the dark with respect to the circumstances of the restraint. The statute provides:

---

**3.** While the court need not look to the circumstances of the plaintiffs' detentions at this juncture, the records submitted by the parties indicate that in all instances in which Donahue and Lawson were detained pursuant to § 40.1–4–11, they were released by the facility administrator within no less than two and no more than six days. Thus, the hope held out by § 40.1–4–11(5) does not appear to be an empty promise.

A copy of the written application for commitment and of the physician's certificate, and a written explanation of the person's right to counsel, shall be given to the person within twenty-four (24) hours after commitment by the administrator, who shall provide a reasonable opportunity for the person to consult counsel.

R.I.Gen.Laws § 40.1–4–11(6).

It is readily apparent from the foregoing analysis that Rhode Island supplies an internee with a number of opportunities to seek to palliate the state's actions and with a variety of means by which to implement such remediation.[4] Though there is no (automatic) next-day hearing, the array of procedural protections is a formidable one— and the entire process seems reasonably calculated to winnow out mistakes in short order.

This is not to say that a probable cause hearing within forty-eight or seventy-two hours, as suggested by the plaintiffs, would not be of some (slight) value in reducing the risk of error. To be sure, such a hearing might weed out a few bevues committed by hospital personnel. (Such a sudden confrontation might, of course, cut in the opposite direction; it might well, by shortstopping diagnostic time, *increase* the risk of error on the side of permissiveness.)

But, due process is not perfect process. A number of other considerations suggest that, in the precincts controlled by R.I.Gen. Laws § 40.1–4–11, such an early hearing is not a constitutional necessity.

First, the hearing requirement may not be as effective in reducing mistakes as the plaintiffs prefer to believe. It is altogether likely that many of the detainees would not be sufficiently detoxified within two or three days to participate meaningfully in a probable cause hearing. It is also reasonable to conclude that any preparation undertaken by hospital authorities during this brief period would be cursory at best and wholly inadequate at worst. *See Coll*, 411 F.Supp. at 911. At the least, the necessity for such preparation would detract from ongoing attention to patient needs. *Cf. Parham*, 442 U.S. at 606, 99 S.Ct. at 2506. ("One factor that must be considered is the utilization of the time of [doctors and specialists] in preparing for and participating in hearings rather than performing the task for which their special training has fitted them.")

Second, the hearing requirement is bound to place a huge fiscal and administrative burden on the state. Even a proceeding without the full panoply of procedures usually associated with a synoptic commitment hearing[5] would be extremely

---

**4.** A person deprived of freedom under the state statute also has recourse to the remedy of the writ of habeas corpus under R.I.Gen.Laws § 10–9–1 (1985). Some courts have found that the availability of such a writ can be a factor in determining the constitutionality of a commitment scheme. *See Project Release*, 722 F.2d at 975; *Logan*, 346 F.Supp. at 1269. But, it has been noted that the "protection [of habeas corpus proceedings] is illusory when a large segment of the protected class cannot realistically be expected to set the proceedings into motion in the first place." *Doe*, 657 F.2d at 1023. Notwithstanding the fact that the guaranty of legal advice built into § 40.1–4–11(6) increases the level of predictable expectations, this court tends to share the sentiments voiced in *Doe*. The habeas corpus factor has been discounted accordingly.

**5.** A compromise of sorts, in the nature of a preliminary probable cause inquiry prior to the final commitment hearing, may loom as a feasible alternative. There is respectable authority for the view that "[d]ue process does not require that the preliminary hearing be as formal and comprehensive as subsequent proceedings for final adjudication." *Bell*, 384 F.Supp. at 1098. *See also* Lessard, 349 F.Supp. at 1092 ("The exigency of the situation, encompassing an emergency situation and lack of time to marshal all facts necessary to an ultimate determination ... precludes a requirement that a hearing at this time encompass all requirements which may be deemed essential at a subsequent hearing.") Courts therefore have permitted the introduction of reports, affidavits, and other materials that would not be admissible or sufficient in a full commitment hearing, *see, e.g., Luna*, 554 F.Supp. at 76; *Kendall v. True*, 391 F.Supp. 413, 419, and have not required that the determination be made by a judicial officer, *see, e.g., Luna*, 554 F.Supp. at 76; *Doe*, 486 F.Supp. at 994. But, the presence of an independent decisionmaker remains indispensable, *see, e.g., Luna*, 554 F.Supp. at 76; *Doe*, 486 F.Supp. at 994, as does the right to be represented by counsel, *see, e.g., Luna*, 554 F.Supp. at 76; *Doremus*, 407 F.Supp. at 515–16; *Bell*, 384 F.Supp. at

costly. As one district court has emphasized, "[d]ue process does not ... require that the focus of State energies and moneys be shifted from the evaluation and treatment ... to strict compliance with detailed procedural requirements." *Project Release v. Prevost,* 551 F.Supp. 1298, 1307 (E.D.N.Y.1982). *Cf. Parham,* 442 U.S. at 605–06, 99 S.Ct. at 2506 ("The State ... has a genuine interest in allocating priority to the diagnosis and treatment of patients as soon as they are admitted to the hospital rather than to time-consuming procedural minuets before the admission."); *French,* 428 F.Supp. at 1355 ("During [the ten day period before the hearing] the respondent is receiving treatment, which may not only aid his mental health, but which also may be necessary to an adequate and informed hearing on the necessity of his commitment."). In this day and age, no state government enjoys the luxury of limitless funds and personnel; the decision to funnel scare resources into care and treatment, rather than into an earlier round of procedural wrangling, strikes a responsive chord.

Third, and most important, the mandatory hearing requirement which the plaintiffs would have this court impose runs a risk far greater than that of an aleatory deprivation in a specific case: such a procedure might well defeat, or at least seriously wound, the state's goal of caring for dangerously intoxicated individuals. If the state's resources are devoted to preparation and conduct of mandatory probable cause hearings, and are, concomitantly, siphoned away from treatment and care, then the decriminalization and "continuum of treatment" that the RIAITA seeks to achieve, *see* R.I.Gen.Laws § 40.1–4–1, will be subverted.

The court recognizes, of course, that there is little magic in any precise span of time. It may well be that Rhode Island could accomplish its legitimate objectives under the RIAITA within a narrower window than ten full days before a probable cause hearing becomes obligatory. Indeed, the provision of the Uniform Act upon which this state statute is patterned declares that "[n]o person committed under this section may be detained in any treatment facility for more than [5] days." Uniform Act § 13(e), 9 U.L.A. 87 (1971). What is more, as originally enacted, § 40.1–4–11 contained the five day maximum, *see* P.L. 1972, ch. 130, but this was extended to ten days in 1984. *See* P.L.1984, ch. 122, § 1.[6] This court cannot say that the five day period was not reasonable. But, the decision to double the span was, within broad limits, one for the General Assembly to make.

■ Courts must be reluctant to usurp legislative prerogatives and must grant a measure of deference to the states in fashioning choices. "The judiciary has no monopoly on sociological wisdom. So long as the state has chosen a format which meets the federal constitutional minimum ... [a federal] court cannot in conscience interfere." *Oaks v. District Court,* 631 F.Supp. 538, 549 (D.R.I.1986). This court may think that Rhode Island could make do with something less than the full ten days, but such finetuning is beyond the court's proper province. "The inquiry is not whether this court thinks a shorter period might be desirable or of greater benefit to the patient, but whether the time span [fixed by the statute] is unconstitutional." *Coll,* 411 F.Supp. at 910. *See also Logan,* 346 F.Supp. at 1269 ("While it is possible that

1098; *Lessard,* 349 F.Supp. at 1092, notice of the grounds for confinement, *see e.g., Luna,* 554 F.Supp. at 76; *Doremus,* 407 F.Supp. at 515; *Bell,* 384 F.Supp. at 1098, and an opportunity to rebut the state's allegations, *see,* e.g., *Luna,* 554 F.Supp. at 76; *Bell,* 384 F.Supp. at 1098. Even an abbreviated, less formulary hearing must have these (and other) minimum prerequisites, or it would be no hearing at all. Thus, the state would be required to expend significant resources if *any* antecedent hearing to determine

probable cause for detention was mandated by this court. And, one wonders if the game would be worth the candle. There is no persuasive reason to believe that such a snapshot exercise would provide a measure of relief commensurate with its cost.

**6.** There is no recorded legislative history in reference to this change. (Unfortunately, such a bare cupboard is par for the Rhode Island course.)

all of this could be concentrated into a shorter period of time, we are satisfied that the time which is allowed by the statute is not so unreasonably long as to amount to a denial of due process.").

Nor is the fact that some states have chosen shorter time periods for emergency detention under comparable circumstances [7] determinative of the issue. In *Addington,* the Court recognized that, in a pluralistic society, such disparities must be tolerated:

> The essence of federalism is that states must be free to develop a variety of solutions to problems and not be forced into a common, uniform mold. As the substantive standards for civil commitment may vary from state to state, procedures must be allowed to vary so long as they meet the constitutional minimum.

441 U.S. at 431, 99 S.Ct. at 1812.

Thus, in rejecting a constitutional challenge to New York's involuntary and emergency commitment statutes, which permit, respectively, sixty day and fifteen day detentions without mandatory judicial review, the Second Circuit emphasized: "That some states have chosen to limit pre-hearing confinement to a shorter period does not mean that such a model 'is needed or is even adaptable to the needs of all states.'" *Project Release,* 722 F.2d at 975 (quoting *Addington,* 441 U.S. at 431, 99 S.Ct. at 1812) (footnote omitted).

So long as the statute rises to the level of the constitutional floor, this court may not quibble with the Rhode Island General Assembly's selection of a maximum ten day commitment without a hearing. The judiciary must be circumspect in reining in any inclination to substitute judicial wisdom for legislative wisdom on matters of policy. As was said by a sister court in approving a ten day involuntary detention for the mentally ill:

> In light of the fact that the inquiry throughout the proceedings is aimed at the respondent's mental health, this Court is very reluctant to substitute another judgment in lieu of the legislature's deference to qualified medical opinion at these initial stages of the involuntary commitment proceedings.

*French,* 428 F.Supp. at 1355. *See also Logan,* 346 F.Supp. at 1269.

This court is particularly reticent to interfere in a scheme which affords care to individuals incapacitated by alcohol. Like the Second Circuit, this court rejects "the premise that civil commitment is tantamount to incarceration for criminal conduct. We acknowledge the deprivation of liberty involved in involuntary civil commitment, but are not prepared to invoke the same procedural standards required in the criminal context." *Project Release,* 722 F.2d at 974–75.[8] It makes minimal sense to treat the emergency commitment of alcoholics as tantamount to the imprisonment of felons, especially since the state legislature has taken great pains to distinguish between the two. *See, e.g.,* R.I.Gen.Laws § 40.1–4–1 ("It is the ... policy of this state that alcoholics and intoxicated persons may not be subjected to criminal prosecution because of their consumption of

---

**7.** The notes accompanying the emergency commitment provision of the Uniform Act indicate that Rhode Island is the only state which permits detention of an individual for more than five days under the U.L.A. prototype. *See* Uniform Act § 13(e), 9 U.L.A. at 86–88 (1971); *id.,* 9 U.L.A. 21 (Supp.1985). This court's review of the statutory schemes of the ten other states which have enacted the Uniform Act confirms that this is so. *See id.* at Supp. 19 for a compendium of states that have enacted the Uniform Act and the respective statutory citations. There are, of course, state laws not patterned on the Uniform Act which go this far and farther.

**8.** To be sure, the parens patriae underpinning for involuntary commitment has come under severe (and somewhat justifiable) attack in recent years. *See, e.g., Doe,* 486 F.Supp. at 994; *Johnson v. Solomon,* 484 F.Supp. 278, 286–87 (D.Md.1979); *Bartley,* 402 F.Supp. at 1046–47; *Kendall,* 391 F.Supp. at 417; *Dixon v. Attorney General of Commonwealth of Pennsylvania,* 325 F.Supp. 966, 972 (M.D.Pa.1971) (three-judge court). To mix family metaphors, there are limits within which the government can play "Big Brother." Though much of that criticism is meritorious, the parens patriae rationale is only peripherally involved in a reasoned evaluation of the RIAITA; more to the point, the Rhode Island law ably balances the governmental and individual interests at stake.

alcoholic beverages...."); *id.* at § 40.1–4–16 (limiting application of state laws and/or municipal ordinances punishing drunkenness).

The Supreme Court has never issued an opinion regarding the length of time the state may involuntarily detain an individual thought to be dangerous without affording a probable cause hearing. The Court's summary affirmances of the decisions in *Logan,* 346 F.Supp. 1265 (D.Conn.1972) (three-judge court), *aff'd sub nom. Briggs v. Arafeh,* 411 U.S. 911, 93 S.Ct. 1556, 36 L.Ed.2d 304 (1973) and *French,* 428 F.Supp. 1351 (M.D.N.C.1977) (three-judge court), *aff'd,* 443 U.S. 901, 99 S.Ct. 3091, 61 L.Ed.2d 869 (1979) are, however, of considerable import. In *Logan,* the Court sustained a decision upholding the constitutionality of the Connecticut scheme allowing involuntary detention for up to forty-five days without a hearing. *Logan,* 346 F.Supp. at 1268–70. In *French,* the Court approved a ten day delay before a mandatory hearing. *French,* 428 F.Supp. at 1355–56. The ten day detention under Rhode Island's emergency commitment provision, § 40.1–4–11, is well within the ambit of the two Supreme Court affirmances.

These dispositions must, in the order of things, be treated as binding authority because "'[v]otes to affirm summarily ... are votes on the merits of a case.'" *Hicks v. Miranda,* 422 U.S. 332, 344, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1975) (quoting *Ohio ex rel. Eaton v. Price,* 360 U.S. 246, 247, 79 S.Ct. 978, 979, 3 L.Ed.2d 1200 (1959)). In several cases since *Logan,* including *French,* lower courts have found the Supreme Court's summary affirmances dispositive. *E.g., Project Release,* 551 F.Supp. at 1307 n. 5; *French,* 428 F.Supp. at 1356; *Coll,* 411 F.Supp. at 910. Although this court does not view the issue as foreclosed by those affirmances—after all, the length of the delay must, in any particular litigation, be considered in the albedo of the statute as a whole, including the extent of its (other) procedural safe-

guards—they lend powerful support to the claim of legitimacy in this instance.

Some comment should be addressed to two recent decisions which have attempted to deflect *Logan* in order to hold that the federal Constitution mandates a hearing within seventy-two hours. *See Luna,* 554 F.Supp. at 73–76 (holding fourteen day delay unconstitutional and distinguishing *Logan* ); *Doe,* 486 F.Supp. at 993–94 (holding seventeen day delay unconstitutional and distinguishing *Logan* ). This court finds those endeavors to be unpersuasive in the circumstances at bar.

The *Luna* court relied heavily on the absence of any meaningful rehabilitation. The court stated that "[w]hen, as [in Texas], a state court orders a proposed patient committed for 'safekeeping' only, the treatment goal which justified the result in *Logan* is absent." *Luna,* 554 F.Supp. at 73. Even if this was a viable distinction (a matter as to which no opinion need be expressed by this court), it is clear that the Rhode Island mosaic goes far beyond warehousing. To the contrary, it provides for immediate treatment in no uncertain terms.

*Doe* tacked in another direction. There, the court found special illumination in the Supreme Court's opinion in *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975): "Since *O'Connor,* ... it is clear that benevolent motivation cannot be a substitute for procedural safeguards." *Doe,* 486 F.Supp. at 994. This court discerns no such incandescence in *O'Connor.* The decision in that case in no way undermines the force of the *Logan* affirmance. The sockdolager is simply this: the Court's affirmance in *French,* substantially postdating the issuance of its opinion in *O'Connor,* dispels any notion that the Court views the Constitution as requiring a hearing in the earliest days of detention.[9]

 This court finds that the procedures employed in the challenged statute, § 40.1–4–11, the additional remedy of the

---

**9.** Both the circuit court and district court opinions in *Doe* failed to take note of the Supreme Court's affirmance in *French. See Doe,* 657 F.2d

at 1021–24; *Doe,* 486 F.Supp. at 992–94. The *Luna* court likewise ignored that development. *See Luna,* 554 F.Supp. at 73.

writ of habeas corpus, and the protections available to a detainee should the state seek to extend confinement beyond ten days, *see* § 40.1–4–12, combine to provide due process safeguards sufficient to meet the federal constitutional minima. Though the period allotted falls toward the outermost periphery of what is permissible, it does not cross that frontier. Ten days is a long time—but it is not unreasonably long in the constitutional sense, having in mind the cross-currents which ebb and flow in these circumstances. Put another way, the benchmark which the General Assembly has set, while perhaps more generous to the state than would be the case in the best of all possible worlds, represents a rational exercise of legislative judgment; it is not so unduly prolonged as to render the enactment constitutionally infirm.[10]

## V. OVERBREADTH AND VAGUENESS

The second string to the plaintiffs' bow is their contention that the standard for emergency commitment under § 40.1–4–11(1)(b) is unconstitutionally vague and overbroad. The full text of § 40.1–4–11(1) reads as follows:

> An intoxicated person who (a) has threatened, attempted, or inflicted physical harm on himself/herself or another and is likely to inflict physical harm on himself/herself or another unless committed, or (b) is incapacitated by alcohol, may be committed to an approved public treatment facility for emergency treatment. A refusal to undergo treatment does not constitute evidence of lack of judgment as to the need for treatment.

The plaintiffs mount a rifleshot challenge; they do not assign constitutional error to § 40.1–4–11(1)(a), a statutory subset which explicitly requires a finding of potential dangerousness to self or others before detention. Rather, Donahue and Lawson level their fire exclusively at § 40.1–4–11(b), which permits the state involuntarily to detain individuals who are "incapacitated by alcohol." This grant of power, they assert, transgresses substantive due process principles.

The operative term "incapacitated by alcohol" is defined in § 40.1–4–2(7) as signifying "a person, who as a result of the use of alcohol is intoxicated to such an extent that he is unconscious or has his judgment otherwise so impaired that he is incapable of realizing and making a rational decision with respect to his need for treatment." Once again, the plaintiffs take careful aim. They do not snipe at the portion of the definition relating to unconsciousness. (By stipulation, the parties have agreed that Donahue and Lawson were not unconscious on the occasions when they were committed involuntarily to the public treatment facility; thus, the unconsciousness criterion is not at issue in this case.) Rather, the plaintiffs contend that the second fascicle

---

**10.** As the plaintiffs point out, the ten day period fixed by the statute can effectively double in certain circumstances. That is, under § 40.1–4–11(5), quoted *ante* at 7, a further delay of up to ten additional days may occur if the petition for a hearing anent involuntary commitment was filed during the initial ten days, yet was not heard and determined within that span. This suit does not squarely confront the question of the constitutionality of such an extension, inasmuch as neither plaintiff—nor any other person, insofar as the instant record reveals—has ever been subjected to or threatened with a pre-hearing detention of such an incremental duration. *See ante* Part II (outlining circumstances of the plaintiffs' confinements). First Amendment cases aside, *e.g., Thornhill v. Alabama,* 310 U.S. 88, 97–98, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940), courts must be careful to refrain from rendering advisory opinions in situations where particular questions are not legitimately raised by a zoetic controversy between litigants actually affected or imminently jeopardized by the operation of the interdicted law. "[F]ederal judicial power is to be exercised to strike down legislation … only at the instance of one who is himself immediately harmed, or immediately threatened with harm, by the challenged action." *Poe v. Ullman,* 367 U.S. 497, 503–04, 81 S.Ct. 1752, 1755–56, 6 L.Ed.2d 989 (1961). *See also Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974); *Shell Oil Co. v. Noel,* 608 F.2d 208, 213 (1st Cir.1979); *Blue Cross of Rhode Island v. Cannon,* 589 F.Supp. 1483, 1489–90 (D.R.I.1984). In that neither Donahue nor Lawson has been injured, or is currently imperilled, by any doubling of the detention period under § 40.1–4–11(5), adjudication of the validity *vel non* of the extension mechanism must await the dawning of another day.

of the definition is so loosely-worded as to permit the state to detain individuals who are not dangerous to themselves or to others, and that the law is in that wise impermissibly overbroad and fatally vague.

Several years ago, the Supreme Court outlined the manner in which a federal court should examine a facial challenge to the overbreadth and vagueness of a law:

> A "facial" challenge ... means a claim that the law is "invalid *in toto*—and therefore incapable of any valid application." In evaluating a facial challenge to a state law, a federal court must ... consider any limiting construction that a state court or enforcement agency has proffered.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 1191 n. 5, 71 L.Ed.2d 362 (1982) (quoting *Steffel v. Thompson*, 415 U.S. 452, 474, 94 S.Ct. 1209, 1223, 39 L.Ed.2d 505 (1974) and citing *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972)).

The Court indicated that the initial judicial "task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct" and is therefore overbroad. *Hoffman Estates*, 455 U.S. at 494, 102 S.Ct. at 1191. Only thereafter does the question of vagueness come into play. *Id.* at 494–95, 102 S.Ct. at 1191–92. This court, in fidelity to these marching orders, turns first to the issue of overbreadth.

### A. Overbreadth

With respect to overbreadth challenges, [The Supreme] Court has repeatedly held that a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.

*NAACP v. Alabama*, 377 U.S. 288, 307, 84 S.Ct. 1302, 1314, 12 L.Ed.2d 325 (1964).

In *NAACP v. Alabama*, the Court reviewed its prior precedents, *see id.* at 307–08, 84 S.Ct. at 1314, including *Cantwell v. Connecticut*, 310 U.S. 296, 304, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940), to the effect that "the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom." The Court likewise quoted with approbation from *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 331 (1960):

> [E]ven though the governmental purpose be substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.

■ Certainly, as indicated in Part IV *ante*, it is permissible for the state compulsorily to detain a person who poses a threat to himself or to others. But, "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." *O'Connor*, 422 U.S. at 576, 95 S.Ct. at 2494. Yet, although a statute which allows state officials imperiously to commit nondangerous individuals may indeed be subject to constitutional attack, the overbreadth doctrine is not properly invoked in this instance.

■ The law does not hold that a statute is unconstitutionally overbroad merely because applications of it which go beyond acceptable constitutional boundaries can be imagined. *Cantwell*, 310 U.S. at 307–11, 60 S.Ct. at 906; *see Broadrick v. Oklahoma*, 413 U.S. 601, 614, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973). The function of facial overbreadth adjudication, the Court has noted, is "a limited one." *Id.* at 615, 93 S.Ct. at 2917. Although expansively worded laws may deter protected activities "to some unknown extent, there comes a point where that effect ... cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing a statute against conduct that is admittedly within its power to proscribe." *Id.* Thus, "particularly where conduct and not merely speech is involved, ... the overbreadth of a statute must not only be real, but substantial as well, judged in relation

to the statute's plainly legitimate sweep."
*Id.*

■ This court discerns no substantial overreaching of this genre in Rhode Island's legislatively-issued warrant to detain an individual whose "judgment [is] so impaired that he is incapable of realizing and making a rational decision with respect to his need for treatment." R.I.Gen.Laws § 40.1–4–2(7). If it is hypothetically possible for a nondangerous individual to be detained under this statutory definition, it is because the definition, like any definition, is somewhat less than exactly precise. Such imprecision, which is in the nature of language itself, bespeaks no more than "the intolerable wrestle with words and meanings" of which Eliot warned;[11] To the extent that the ordinance sounds constitutional overtones, it implicates vagueness concerns rather than overbreadth. At bottom, the plaintiffs' objection must be that they cannot determine whether the "incapacitated by alcohol" standard encompasses behavior which may not permissibly be regulated by the state; that is a vagueness challenge. *See Hoffman Estates,* 455 U.S. at 497 n. 9, 102 S.Ct. at 1192 n. 9 ("If [appellee] is objecting that it cannot determine whether the ordinance regulates items with some lawful uses, then it is complaining of vagueness.").

Overbreadth is not the issue—and passionate rhetoric will not make it so. It avails the plaintiffs nothing to paint the lily by the undisciplined use of an additional epithet. The court therefore regards this aspect of the plaintiffs' challenge as "a periphrastic strawman, as easily dismissed as raised." *Golemis v. Kirby,* 632 F.Supp. 159 (D.R.I.1985). The true battleground here is the question of excessive vagueness.

### B. *Vagueness*

A bill is void for vagueness if it " 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute,' " *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972) (quoting *United States v. Hariss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed.2d 989 (1954)), or if it "permits and encourages an arbitrary and discriminatory enforcement of the law." *Id.* at 170, 92 S.Ct. at 847. *See also Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972); *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); *Precious Metals Associates, Inc. v. Commodity Futures Trading Commission,* 620 F.2d 900, 906–07 (1st Cir.1980).[12]

■ The plaintiffs' attack on § 40.1–4–11 strikes only tangentially at the concern that the "incapacitated by alcohol" standard fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned,* 408 U.S. at 108, 92 S.Ct. at 2298. The statute was not designed to prohibit or discourage undesirable conduct, but rather to protect individuals who are incapable of controlling their behavior or caring for themselves because of the deleterious effects of alcohol. *See generally* R.I.Gen.Laws § 40.1–4–1 (declaration of policy, quoted *ante*). Thus, prenotification is not really the point. A sister court, in evaluating a standard for civil commitment, wisely rejected the argument that a statute of this sort did not furnish sufficient foreknowledge, remarking:

> [E]ven though [the civil commitment standard] may not have provided adequate warning, it would not appear to be

---

**11.** T.S. Eliot, *East Coker,* II (1940).

**12.** Although the vagueness doctrine is ordinarily applied to criminal statutes, it has also been used in the context of civil statutes which deprive an individual of liberty or property without due process. *See Boutilier v. INS,* 387 U.S. 118, 123, 87 S.Ct. 1563, 1566, 18 L.Ed.2d 661 (1967); *Giaccio v. Pennsylvania,* 382 U.S. 399, 402, 86 S.Ct. 518, 520, 15 L.Ed.2d 447 (1966); *A.B. Small Co. v. American Sugar Refining Co.,* 267 U.S. 233, 239, 45 S.Ct. 295, 297, 69 L.Ed. 589 (1925); *Healey v. Bendick,* 628 F.Supp. 681, 691, 692 (D.R.I.1986). "[W]hether labeled 'penal' or not, [a statute] must meet the challenge that it is unconstitutionally vague." *Giaccio,* 382 U.S. at 402, 86 S.Ct. at 520.

unconstitutional in the civil commitment context where identification for purposes of treatment and prevention of danger to society are the primary goals, not deterrence of undesirable conduct.

*Stamus v. Leonhardt,* 414 F.Supp. 439, 452.

This conclusion by no means marks the journey's end. The flip side of the vagueness coin must still be confronted head-on. The central thrust of the plaintiffs' asseveration is that the enactment allows state officials overgenerous discretion in determining who is "incapacitated by alcohol" and what constitutes a sufficient condition of incapacitation. This being so, the plaintiffs reason, the statute fails to "provide explicit standards for those who apply [the law]," *Grayned* 408 U.S. at 108, 92 S.Ct. at 2299, and "impermissibly delegates basic policy matters to [officials] for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108–09, 92 S.Ct. at 2299 (footnote omitted). It is upon this argument that the vagueness challenge necessarily stands or falls.

In order accurately to gauge the constitutional adequacy of the "incapacitated by alcohol" standard which the RIAITA imposes, the statutory definition itself must be assayed. Thus, this court must determine whether or not the ceded permission to detain "a person who ... has his judgment otherwise so impaired that he is incapable of realizing or making a rational decision with respect to his need for treatment," R.I.Gen.Laws § 40.1–4–2(7), is prohibitively vague. The court's role in this endeavor, however, is somewhat circumscribed:

> The court should examine the facial vagueness challenge and ... should uphold the challenge *only if the enactment is impermissibly vague in all of its applications.* A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law.

*Hoffman Estates,* 455 U.S. at 494–95, 102 S.Ct. at 1191 & 1192 (emphasis added; footnote omitted).

Quoting many of its earlier decisions, the Supreme Court in *Hoffman Estates, id.* at 495 n. 7, 102 S.Ct. at 1191 n. 7 lately indicated that a plaintiff challenging a statute for vagueness faces numerous obstacles:

> "[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975). See *United States v. Powell,* 423 U.S. 87, 92–93, 96 S.Ct. 316, 319–20, 46 L.Ed.2d 228 (1975); *United States v. National Dairy Products Corp.,* 372 U.S. 29, 32–33, 36, 83 S.Ct. 594, 597–98, 599, 9 L.Ed.2d 561 (1963). "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974). [T]o sustain such a challenge, the complainant must prove that the enactment is vague " 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.' " *Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971).

In evaluating whether or not the "incapacitated by alcohol" standard is impermissibly vague as applied to Donahue and/or Lawson, the court rejects out of hand the plaintiffs' thinly-veiled implication that any standard which utilizes words is inherently amphibolous and therefore unconstitutional. The Court, in effect, rendered judicial ears deaf to such a doleful lamentation when it pointed out: "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned,* 408 U.S. at 110, 92 S.Ct. at 2300 (footnote omitted). The *Grayned* Court cautioned: "It will always be true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of

[disputed] terms will be in nice question.' " *Id.* at 110 n. 15, 92 S.Ct. at 2300 n. 15 (quoting *American Communications Association v. Douds,* 339 U.S. 382, 412, 70 S.Ct. 674, 691, 94 L.Ed. 925 (1950)). *See also Broadrick,* 413 U.S. at 608, 93 S.Ct. at 2913 (quoting *United States Civil Service Commission v. National Association of Letter Carriers, AFL–CIO,* 413 U.S. 548, 578–79, 93 S.Ct. 2880, 2897 (1973)) ("Words inevitably contain germs of uncertainty.... '[T]here are limitations in the English language ... and ... although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest.' ")

There is a special point to be made as well. The law at issue in this case does not purport to fix the days of the year when deer may be hunted or the speed at which a motor vehicle may allowably be driven. It deals, instead, with matters which are part science, part art—matters which are less then perfectly and precisely understood even by the most erudite professionals.

Where, as here, medical judgments are necessarily a part of the statutory scheme, courts have justifiably been inclined to be more generous in evaluating the consititutionality of the selected statutory language. In rejecting an assault on the term "defective delinquent," for example, the Fourth Circuit concluded:

Although we recognize the risk of vagueness inherent in the terminology employed, an attempt to make precise legal definitions of medical concepts embodies a risk of overdefinition.

*Tippett v. Maryland,* 436 F.2d 1153, 1157 n. 15 (4th Cir.1971), *cert. dismissed sub nom. Murel v. Baltimore City Criminal Court,* 407 U.S. 355, 92 S.Ct. 2091, 32 L.Ed.2d 791(1972); *see also In re Alexander,* 336 F.Supp. 1305, 1308 (D.D.C.1972) (upholding commitment of person "likely to injure himself" or others; quoting *Tippett* ).

Though the nature and subject matter of the law may in this way serve as a check on the swing of the pendulum in the direction of constitutional infirmity, this does not mean that the opposite impetus can be given free sway. The Court has stated that individuals may not be confined "merely to ensure them a living standard superior to that they enjoy in the private community." *O'Connor,* 422 U.S. at 575, 95 S.Ct. at 2493. Put another way, "there is ... no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom." *Id.* Obviously, notwithstanding the play necessarily inherent in codifying essentially medical judgments, legislation in this area cannot sweep so broadly as to capture every person who, howsoever improvidently, habitually allows alcoholic beverages to pass his lips. Ours is a society which values freedom highly, including, within wide limits, the freedom of self-indulgence in bad habits. The focus must be on the potentiality for harm. Yet, even a relatively commonplace concept such as "dangerousness" can have a quicksilver quality.

There can be no unwavering bright-line rule in these purlieus. Lawmakers must be given a certain latitude in the thankless task of attempting to write difficult medical and social concepts into legislation of general applicability. And in this sense, the salutary purposes to be served by reining in the (potentially) arbitrary exercise of official authority must be balanced against the inherent limitations upon the communicative and expressive powers of man and language and against the somewhat compressed borders of scientific knowledge. As the Court has recognized, "[t]he words of the ... ordinance [can be] marked by 'flexibility and reasonable breadth, rather than meticulous specificity,' [so long as] it is clear what the ordinance as a whole prohibits." *Grayned,* 408 U.S. at 110, 92 S.Ct. at 2300 (citations omitted).

One matter is not at all vague or indistinct: a court should "not pass on the constitutionality of [a statute] if a construction of the statute is fairly possible by which the question may be avoided." *United States v. Clark,* 445 U.S. 23, 27, 100 S.Ct. 895, 899, 63 L.Ed.2d 171 (1980). *See also*

*Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 348, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Aggarwal v. Ponce School of Medicine*, 745 F.2d 723, 726 (1st Cir.1984); *In re Evans*, 452 F.2d 1239, 1246 (D.C.Cir.1971), *cert. denied*, 408 U.S. 930, 92 S.Ct. 2479, 33 L.Ed.2d 342 (1972). Certain presumptions must guide a court in its evaluation of a constitutional foray against a statute:

> The first of these presumptions is that legislation duly enacted by [the legislature] is constitutional. A corollary to this basic presumption is the principle that, when one interpretation of a statute would create a substantial doubt as to the statute's constitutional validity, the courts will avoid that interpretation absent a "clear statement" of a contrary legislative intent. When a statute is fairly subject to a variety of interpretations all but one of which would make it unconstitutional, then the courts must presume [the legislature] intended the interpretation which is constitutionally permissible. Thus if [the challenger's] interpretation of the [statute] would produce an unconstitutional result, there is at least a strong prima facie argument that the interpretation is erroneous.

*United States v. Thompson*, 452 F.2d 1333, 1337 (D.C.Cir.1971) (citations omitted), *cert. denied*, 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972).

The presumption of constitutionality requires that this court, at the threshold, assume that the challenged law comports with due process. It would be error to shun a constitutionally sufficient interpretation of the interdicted statutory phraseology if one is readily and logically to be found. Equally as important, this search cannot proceed in a sterile intellectual vacuum:

> "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." Our objective ... is to ascertain the [legislative] intent and give effect to the legislative will.

*Philbrook v. Glodgett*, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975)

(quoting *Chemehuevi Tribe of Indians v. Federal Power Commission*, 420 U.S. 395, 402–03, 95 S.Ct. 1066, 1071–72; 43 L.Ed.2d 279 (1975)). *See also Richards v. United States*, 369 U.S. 1, 11, 82 S.Ct. 585, 592, 7 L.Ed.2d 492 (1962); *United States v. Heirs of Boisdore*, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1849)); *United States v. New England Coal and Coke Co.*, 318 F.2d 138, 142–43 (1st Cir.1963).

Viewed alone, the disputed portion of the RIAITA certainly contains some ambiguity. An individual whose "judgment [is] so impaired that he is incapable of realizing and making a rational decision with respect to his need for treatment," R.I.Gen.Laws § 40.1–4–2(7), might conceivably be a person who is in need of treatment, but who is not currently a danger to himself or to others. And, the mere need for treatment will not suffice to uphold involuntary detention of an individual who is "capable of surviving safely in freedom," *O'Connor*, 422 U.S. at 575, 95 S.Ct. at 2484, even though that person may have a compulsion to consume alcohol, may be deteriorating from the effects of alcohol, and may be helped by treatment. *See id.* at 573–76, 2492–94; *see also Lessard*, 349 F.Supp. at 1094 ("Persons in need of hospitalization for physical ailments are allowed the choice of whether to undergo hospitalization and treatment or not. The same should be true of persons in need of treatment for mental illness.... [M]any people ... could benefit from some sort of treatment at different periods in their lives....[T]he rational choice in many instances would be to forego treatment....."); *cf. Doremus*, 407 F.Supp. at 514 ("To permit involuntary commitment upon a finding of 'mental illness' and the need for treatment alone would be tantamount to condoning the State's commitment of persons deemed socially undesirable for the purpose of indoctrination or conforming the individual's beliefs to the beliefs of the State."). Yet, when read in conjuction with other portions of the emergency commitment provision against the policies of the RIAITA scheme as a backdrop, the "incapacitated by alcohol" stan-

dard necessarily refers to more than the mere need for treatment.

In order to discern the authentic will of the Rhode Island General Assembly in this regard, the definition of "incapacitated by alcohol" must be compared to the definition of "intoxicated person" that is employed in the RIAITA matrix. An "intoxicated person," R.I.Gen.Laws § 40.1–4–2(6), is "a person whose mental or physical functioning is substantially impaired as a result of the use of alcohol." Under the emergency commitment provision, it is not enough that the individual be an "intoxicated person;" rather, a person committed under the disputed portion of § 40.1–4–11 must be both intoxicated *and* incapacitated by alcohol. This is powerful evidence that the General Assembly, in employing the "incapacited by alcohol" standard in § 40.1–4–11, intended something more than "intoxicat[ion]" alone, that is, that the person be more than merely "substantially impaired"—and this confluence of terminology strongly suggests that a need for treatment, in and of itself, will not suffice. After all, someone who is beyond a state of substantial impairment is bound to be well past the threshold of treatment need.

There is a further point which merits the attention of a thoughtful court. The RIAITA, viewed in its entirety, makes manifest that the legislature also sought to protect an individual who declines treatment. Section 40.1–4–11(1) specifically declares that "[a] refusal to undergo treatment does not constitute evidence of lack of judgment as to the need for treatment." Thus, in promulgating the emergency commitment statute, the General Assembly did not seek involuntarily to confine individuals who, though they would benefit by treatment, were not in dire circumstances. Reading the various portions of the emergency provision in harmony with the totality of the statutory scheme, and mindful of the penchant of alcoholics to deny that they need treatment at all (and ofttimes, even to deny the existence of their addiction), the court concludes that the "incapacitated by alcohol" standard does not encompass an individual whose need for treatment is not of a considerable magnitude.

Once these limitations are engrafted onto § 40.1–4–11, the concept of dangerousness inches inexorably into view: an individual whose impairment has transcended "substantial" and whose need for treatment has become "considerable" is, by reasonable extrapolation, highly likely to be at significant personal risk and/or to pose a realistic threat to other persons. Seen in this light, the Rhode Island definition may be viewed not only as encompassing the notion of "dangerousness" but also as surpassing that plateau. The two-pronged standard of "transcending substantial impairment" cum "considerable need for treatment" surmounts the *O'Connor* floor; indeed, it may well provide clearer, better-defined guidance to those charged with statutory enforcement than the stock formulation of "dangerous to himself or to others." Certainly, the Rhode Island approach, held within the definitional boundaries suggested above, contains no more (and arguably, fewer) of the seeds of subjectivity than the classic incantation.

Such a reading of the RIAITA draws sustenance from existing caselaw relative to the involuntary commitment of the mentally ill. The Supreme Court has construed civil commitment standards liberally so as to embrace the dangerousness requirement. In *Jackson v. Indiana*, the Court held that a statute which defined a "mentally ill person" as one who "requires ... detention in the interest of the welfare of such person or others" appeared "to require an independent showing of dangerousness." 406 U.S. at 728, 92 S.Ct. at 1853 (construing Ind.Ann.Stat. § 22–1201(1)). In *Humphrey v. Cady*, the Court, in dicta, addressed a statute which equated "mental illness" with "mental disease to such extent that a person so afflicted requires care and treatment for his own welfare, or the welfare of others, or of the community." 405 U.S. at 509 & n. 4, 92 S.Ct. at 1052 n. 4 (discussing Wis.Stat.Ann. § 51.75, Art. II(f)). The Court found implicit in this definition a requirement that a person's "potential for doing harm, to himself or to others, is great enough to justify such a massive curtailment of liberty." *Id.* at 509,

92 S.Ct. at 1052. Such precedents are helpful here.

Lower courts that have entertained vagueness challenges to temporary commitment statutes also provide some direction. In applying the *O'Connor* requirements to definitions of mental illness, it has been recognized that "[t]he threat of harm to oneself may be through neglect or inability to care for oneself." *Doremus*, 407 F.Supp. at 515. *See also Doe*, 486 F.Supp. at 991; *Lynch*, 386 F.Supp. at 391. That approach has the ring of plausibility. As one court has explained:

> In the case of dangerousness to self, both the threat of physical injury and discernible physical neglect may warrant a finding of dangerousness. Although he does not threaten actual violence to himself, a person may be properly commitable under the dangerousness standard if it can be shown that he is mentally ill, that his mental illness manifests itself in neglect or refusal to care for himself, that such neglect or refusal poses a real and present threat of substantial harm to his well-being, and that he is incompetent to determine for himself whether treatment for his mental illness would be desirable.

*Lynch*, 386 F.Supp. at 391.

Viewing the concept of dangerousness in this fashion, the court in *Doe*, 486 F.Supp. at 991, rejected a vagueness challenge to a California statute which allowed the involuntary confinement of the "gravely disabled," and which defined that term as "[a] condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing or shelter." Cal.Welf. & Inst. Code § 5008(h)(1). The court found that the standard "implicitly requires a finding of harm to self: an inability to provide for one's basic personal needs." *Doe*, 486 F.Supp. at 991.

Other tribunals have taken a similarly expansive look at civil commitment standards. One court rejected a challenge to a statute which authorized officials to detain "any person whose condition or actions are such that it is necessary that he receive an immediate examination or immediate care and treatment at a psychiatric facility." Hawaii Rev.Stat. § 334–54. Examining the law in its entirety, the court concluded:

> While certain language in the section, standing alone, might seem to encompass more situations than those in which a person is engaged in criminal behavior or poses an immediate danger to himself or to others, a reading of the section as a whole and in the context of the entire statute makes it clear that the section was intended to be so limited.

*Suzuki*, 411 F.Supp. at 1125.

Another court rejected a facial challenge to the Wisconsin civil commitment statute discussed by the Supreme Court in *Humphrey*. It concluded that the Court's

> approval of a requirement that the potential for doing harm be "*great enough* to justify such a *massive curtailment* of liberty" implies a balancing test in which the state must bear the burden of proving that there is an extreme likelihood that if the person is not confined he will do immediate harm to himself or others.

*Lessard*, 349 F.Supp. at 1093 (quoting *Humphrey*, 405 U.S. at 509, 92 S.Ct. at 1052) (emphasis in original).

It is noteworthy, too, that in construing a state statute, a federal court must defer to the highest court of a state as the best arbiter of state law. *See Commissioner v. Estate of Bosch*, 387 U.S. 456, 462, 87 S.Ct. 1776, 1781, 18 L.Ed.2d 886 (1967); *Ragan v. Merchants Transfer & Warehouse Co.*, 337 U.S. 530, 534, 69 S.Ct. 1233, 1235, 93 L.Ed. 1520 (1949). (Such deference involves the meaning of the enactment; once the meaning is established, the question of whether or not the ordinance passes constitutional muster is one within the primacy of the federal courts.) In this instance, the state supreme court has yet to interpret the relevant provisions of the RIAITA. Nevertheless, the decisions of that tribunal offer some helpful guides to statutory construction generally.

Under Rhode Island law, it is well settled that the words contained in enactments of the General Assembly should not be inter-

preted in a vacuum. *City of Warwick v. Almac's, Inc.*, 442 A.2d 1265, 1272 (R.I. 1982). Statutes should be read to convey "a definite and sensible meaning that does not contradict an evident legislative purpose." *Rathbun v. Leesona Corp.*, 460 A.2d 931, 933 (R.I.1983). In divining the legislative will, "[n]o sentence, clause or word should be construed as unmeaning or surplusage, if a construction can be legitimately found which will give force to and preserve all the words of the statute." *St. Clare Home v. Donnelly*, 117 R.I. 464, 368 A.2d 1214, 1217–18 (1977). *See also Blue Cross of Rhode Island*, 589 F.Supp. at 1491; *Montaquila v. St. Cyr*, 433 A.2d 206, 214 (R.I.1981). Even if the literal meaning of the words suggests the contrary, Rhode Island courts have been admonished to refrain from thwarting the "discovered intendment of the legislature." *Warren Education Association v. Lapan*, 103 R.I. 163, 235 A.2d 866, 872 (1967). As this court, in an earlier endeavor to summarize the Rhode Island Supreme Court's triage of the canons of construction, has observed:

> There is a fine line to be walked which separates unacceptable judicial rewriting of statutes from salutary efforts judicially to synthesize the true meaning and intent which was in the collective minds of a legislative majority when any particular law was enacted.

*Blue Cross of Rhode Island*, 589 F.Supp. at 1491.

These principles of statutory construction, firmly embedded in the mosaic of Rhode Island jurisprudence, likewise counsel in favor of reading the RIAITA as a whole, charting the "incapacitated by alcohol" standard not as an island but as a part of the overall topography of the Act, and attempting to translate the challenged phrase (where, as here, it is possible to do so without overreaching, distortion, or mental gymnastics) in a manner which harmonizes with the evident purpose and intendment of the Rhode Island General Assembly.

In this case, the legislative will is clear. The words of § 40.1–4–11, though cryptic, can plausibly be read to convey a sensible meaning, a meaning which dovetails with the overall objectives of the entire statute and which does not run afoul of the imperatives of the federal Constitution. Federal precedent encourages the adoption of such an interpretation, and the reported opinions of the state supreme court indicate, in a general sense, that the law can and should be translated in the suggested fashion.

The situation portrayed by the RIAITA is not one in which the state may detain an individual whose "affliction ... falls anywhere within a vast, uncontoured description of mental ills ... whether his particular ill presents a realistic threat of harm to himself or to others." *Bell*, 384 F.Supp. at 1096. The "incapacitated by alcohol" standard, taken in context, goes far beyond those impermissibly vague statutes which authorized the detention of the mentally ill simply because it appeared (to someone) "necessary and essential to do so," *id.*, or where there was nothing more than a "need for observation and treatment." *Kendall*, 391 F.Supp. at 418. Such laws, and their congenators, *e.g.*, *Goldy v. Beal*, 429 F.Supp. 640, 646–48 (M.D.Pa.1976) (three-judge court) (striking down statute which defined "mental disability" as "any mental illness ... which so lessens the capacity of a person to use his customary self-control, judgment and discretion ... as to make it necessary or advisable for him to be under care"); *Stamus*, 414 F.Supp. at 451–52 (striking down statute which authorized detention of individual who "is believed to be mentally ill and a fit subject for custody and treatment in the hospital); *Doremus*, 407 F.Supp. at 513–15 (striking down statute which authorized detention of individual who is "mentally ill" and "a fit subject for custody and treatment in a hospital"), have rightfully been seen as overly nebulous. They contained too "few visible limits ... to guide court or citizen." *Bell*, 384 F.Supp. at 1096 (footnote omitted). The case at bar concerns a materially different breed of cat.

▪ Notwithstanding the fact that certain language in the challenged section, standing in a vacuum, might well seem to

snare within its net persons who have not exhibited a potentiality for dangerousness, the court rejects the plaintiffs' effort to interpret the law in that stilted manner. To scan § 40.1–4–11 so mechanically would require honoring literalism at the expense of evident meaning and legislative purpose. The stakes are far too high to deal the cards in such a closefisted way. This court concludes that R.I.Gen.Laws § 40.1–4–11, read reasonably and in the context of the RIAITA as a whole, makes it sufficiently clear that the sweep of the statutory phrase "incapacitated by alcohol" was intended to be self-limiting to situations where a putative detainee has posed a relatively immediate threat to himself or to others, that is, that the statute implicitly requires, as a condition precedent to emergency commitment, that the subject's potential for harming himself or others be critical enough to justify the "massive curtailment of liberty," *Humphrey*, 405 U.S. at 509, which such confinement entails. Though expressed in terms of a condition "transcending substantial impairment" and accompanied by a "considerable need for treatment," *see ante* at 1476–1477, the criterion is one of dangerousness.[13] The statute must be read and implemented in such a vein, requiring inter alia an independent showing sufficient to trigger this condition. Accordingly, the statutory standard is a permissible one—dangerousness—and the plaintiffs' vagueness assault must be repulsed. The claim of constitutional repugnance is unfounded.

## VI. CONCLUSION

As framed by the first count of the second amended complaint, this case does not center around concerns of "good" versus "bad," of morality versus immorality, or even of desirable conduct versus undesir-

able conduct. Alcoholism, though itself a damnable evil, is not a manifestation of evil. Rather, it is a dread disease which ranks among the deadliest scourges of our time. Society has labored long and hard— yet withal, perhaps neither long enough nor hard enough—to understand and come to grips with this affliction. In enacting and thereafter in periodically updating the RIAITA, the Rhode Island General Assembly has made a principled effort to fulfill the state's manifold responsibilities in this regard. The end product of that endeavor, the current-day version of the RIAITA, is perhaps not perfect, but it is adequate to survive the rigors of the constitutional challenge which Donahue and Lawson have launched.

The emergency commitment provisions of the statute are, in the nature of things, bound to be a sore spot. The concept of any noncriminal, nonconsensual deprivation of liberty without the benefit of prenotification and an opportunity meaningfully to be heard is anathematic to deeply-ingrained notions of fairness in this great and free land. Yet in this whisky-ravaged setting, ample cause exists to permit such detention under exigent circumstances, so long as closely-tailored restrictions are imposed. An alcoholic, already imprisoned within his own addiction, cannot be involuntarily confined by the state, even if the sovereign (wisely) regards such confinement to be in the alcoholic's best interest, without proper obeisance to applicable constitutional safeguards. The Rhode Island enactment contains enough prophylactic shielding to pass this test.

■ To the extent of the contentions which have been advanced in this case, R.I.Gen.Laws § 40.1–4–11 remains unsullied. Although the questions are close and the answers not entirely free from doubt,[14]

---

**13.** Dangerousness to self, as that concept exists within § 40.1–4–11, embodies not only the potential for violence turned inward, but the threat of self-neglect at a level which, fairly viewed, would pose a clear and present risk of substantial harm to the actor's wellbeing. *See* *Lynch,* 386 F.Supp. at 391.

**14.** The issues which these plaintiffs have raised concerning the constitutionality of the statute

implicate "controlling question[s] of law as to which there is substantial ground for difference of opinion." 28 U.S.C. § 1292(b). In this court's estimation, they are fairly debatable. Here, as in *Chang v. University of Rhode Island,* 606 F.Supp. 1161, 1279 (D.R.I.1985), the case presents "an interleaved series of difficult and pivotal questions of law," the answers to which are less than wholly certain. An immediate appeal might well, in the long run, serve materi-

the statute endures. The court declines the plaintiffs' invitation to balkanize the RIAITA; a more global examination is warranted. So viewed, § 40.1–4–11 sufficiently incorporates the idea of dangerousness into the statutory mosaic so as to allow the emergency commitment of one "incapacitated by alcohol." The law is, in this aspect, neither overbroad nor unlawfully vague. And, once detention has occurred, the period of time antecedent to the holding of a mandatory probable cause hearing—short of any consideration of a possible extension of that span, *see ante* n.10—is not unreasonably overlong. The red flag of constitutional breach does not fly from these ramparts.

The court finds and declares that the statute, on its face, affords at least the minimum process which is constitutionally due. Count I of the second amended complaint is therefore unavailing and must be dismissed.

*Settle order on notice.*

ally to advance the ultimate resolution of the litigation. Moreover, when one considers the critical importance of the statute, interlocutory review would surely redound to the benefit of not only the parties but also the citizenry. Thus, although the court is mindful that intermediate appeals are disfavored and should be employed only in extraordinary circumstances, *McGillicuddy v. Clements,* 746 F.2d 76, 76 n.1 (1st Cir.1984); *Chang,* 606 F.Supp. at 1279, this case fits neatly within that narrow integument. Therefore, should the plaintiffs wish to essay an interlocutory appeal in pursuance of 28 U.S.C. § 1292(b), the court stands disposed, upon timely presentment of a request to that effect, to issue a § 1292(b) certificate.